IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER McLIN, as Administrator | ) | |
| of the Estate of WILLIAM HOPE, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 10 cv  5076 |
| | ) | |
| CITY OF CHICAGO, a municipal corporation, | ) | |
| OFFICER MICHAEL ST.CLAIR (#15527), and | ) | Judge Matthew Kennelly |
| OFFICER ARMANDO UGARTE (#15050), | ) | |
| | ) | |
| Defendants. | ) | |

PLAINTIFF'S RESPONSE TO DEFENDANTS' POST-TRIAL MOTION

Plaintiff Jennifer McLin, as Administrator of the Estate of William Hope, Jr., by her

attorneys, Mark Parts and Faith Spencer of Parts & Spencer, Ltd., respectfully requests that this

Honorable Court deny defendants' post trial motion in its entirety and states as follows:

INTRODUCTION

This case arises from the unlawful seizure and unjustified lethal shooting of William

Hope, Jr. It was tried to a jury in late October and early November 2012, and the jury reached a

unanimous verdict in favor of plaintiff on all counts: federal law unlawful seizure, federal law

excessive force, state law improper detention and state law battery. The jury also awarded

punitive damages against both defendant officers.

Defendants raise two claims: (1) for judgment in their favor pursuant to FRCP 50(b) on

the federal seizure and state law detention claims; (2) for a new trial based upon exclusion of

certain evidence and claimed error in the damages instruction for the seizure and detention

claims. The verdict is well-supported by the facts and the law and defendants' ill-founded

challenge to it should be rejected. Indeed, it would be unjust to grant the relief requested.

I.      DEFENDANTS' REQUEST FOR JUDGMENT AS A MATTER OF LAW ON THE
        SEIZURE AND DETENTION CLAIMS SHOULD BE DENIED

In considering a motion for judgment as a matter of law under Rule 50(b), a court is to view the evidence and all reasonable inferences in the light most favorable to the party who prevailed at trial. As this Court noted in *Phoenix Bond & Indem. Co. v. Bridge*, 2012 U.S. Dist. LEXIS 125780, 8-9 (N.D. Ill. Sept. 5, 2012):

> A court may enter judgment as a matter of law in a party's favor only if "the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is [not] sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011). A jury's verdict may be overturned "only if no reasonable juror could have found in the [prevailing party's] favor." Id. The Court "must construe the facts strictly in favor of the party that prevailed at trial." *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011).

Defendants incorrectly state in their motion, p.3, that "inferences drawn from the evidence must be taken in a light most favorable to the party against whom judgment was granted."

At the close of evidence, counsel for plaintiff and for defendants both made motions for judgment as a matter of law in their clients' favor on the unlawful seizure claim. The Court denied defendants' motion outright and stated that plaintiff's motion was "closer" and took it under advisement. Tr. 492-99.[1] Defendants' request for judgment as a matter of law was not proper then, is not proper now, and should be denied.

A.      Defendants' seizure and detention of William Hope, Jr., was not supported by
        reasonable suspicion at its outset or at any time for its duration.

As noted in the Motion, a valid "*Terry* stop" requires that an officer have a reasonable suspicion that the person stopped has committed or is about to commit a crime. Motion at 4. A *Terry* stop must be justified at its inception by reasonable suspicion, supported by articulable

---

[1]   Accompanying this Response are three group exhibits: (1) a set of all trial transcript pages cited, corresponding with references herein designated Tr. or by witness name; (2) Patricia Polk deposition pages from trial cited; and (3) a set of plaintiff's exhibits cited, corresponding with references herein designated Pl. Ex. -.

facts, that criminal activity is afoot. *U.S. v Ienco*, 182 F.3d 517, 523 (7th Cir. 1999). As the

Supreme Court said in *Terry*, the question is whether by an objective standard the facts available

to the officer at the moment of the seizure warranted the seizure. *Terry v. Ohio*, 392 U.S. 1, 21-

22 (1968) (citations omitted). And, as this Court stated in *Cross v. City*, 2004 U.S. Dist. LEXIS

23518, *5 (N.D. Ill. Nov. 19, 2004), "a 'hunch' or general suspicion that a suspect is engaging in

criminal activity will not justify a *Terry* stop." The jury properly found that that Mr. Hope was

unlawfully seized and detained. Defendants' failure to present relevant authority supporting

judgment in their favor on the facts of this case reflects that their position as to the seizure and

detention issue is unfounded.

On the day of the incident, July 8, 2010, Defendants Ugarte and St.Clair were on routine

patrol driving Eastbound on 75th Street when they approached the Popeyes restaurant at 75th and

Perry. Ugarte 54:7-9. They had received no alert, call for service or report of any criminal

activity in the area on that day; no request for help or investigation from the Popeyes; and no

report about Mr. Hope or his car. Ugarte 52:1-20, 55:18-23, 66:10-15; St.Clair 178:10-179:5.

The evidence presented at trial did not reflect any ongoing criminal activity in the area or that

this was a "high crime" area.

As defendants approached, it was lunchtime on a sunny summer day, and Mr. Hope was

sitting in his car backed into a regular, clearly visible parking space in the Popeyes lot, with a

curb behind his car.[2] Ugarte: 52:21-23, 57:17-22, 60:8-9, 88:9-11; St.Clair 184:7-9, 188:24-25,

215:4-6. He was parked in a lot along the side of the restaurant, facing the west wall of the

restaurant. Resa 430:19-21. Defendants did not know Mr. Hope and had no information as to

him or his car as they approached. Ugarte 52:1-20, 55:18-23. At about the time they were driving

---

[2] The actual wide open position of Mr. Hope's car is in contrast with Defendant St.Clair's description of it to the lead detectives as being "secluded." *See* St.Clair 188:4-7.

in the entrance to the parking lot, defendants first observed that there was an African-American male in the car, but they knew nothing more about him. St.Clair 190:20-23. Although Defendant Ugarte acknowledged at trial that he initially falsely told detectives that he had stopped and observed Mr. Hope's vehicle before pulling in and parking in front of it, he admitted at trial that he was driving when he first observed the car and did not stop before parking in front of it. Ugarte 58:21-59:2. Defendants conducted no surveillance of Mr. Hope's activities and did not even run the plates of his car before approaching. Ugarte 58:13-16, 68:7-10.

Defendant Ugarte, the driver, pulled the police SUV to a stop perpendicular to Mr. Hope's car approximately one to two feet directly in front of it at a "T", so that the car was blocked in by the curb in back and by the police SUV in front. Ugarte 63:18-64:3, 70:20-23; St.Clair 184:10-12, 185:4-12; Johnson 146:16-19; Bryant 311:14-16; Polk dep 8:6-17, 11:21-12:5, 13:1-14; Resa 430:22-25. Defendant St.Clair described it as a Terry stop when they first pulled up and stated that his position when he approached the vehicle was that Mr. Hope was not free to go until he was finished investigating. St.Clair 202:13-16, 260:24-261:3. As Defendants exited their SUV they both left their doors open and promptly went to the driver's side of Mr. Hope's car, such that he was blocked in on the right by the open passenger side door of the SUV and on the left by the officers approaching his car. Ugarte 68:22-69:3; 70:24-25; Resa 431:1-13.

There was no objective basis for claiming reasonable suspicion of criminal activity by Mr. Hope at the time of this initial seizure. St.Clair 191:8-17; 193:1-10; 199:25-200:9. All the Defendants knew was that Mr. Hope was an African-American male sitting in a car in a restaurant parking lot at lunchtime. Ugarte 71:7-10; St.Clair 188:22-25, 190:20-23. There was nothing illegal about his being backed into a parking spot; indeed, Defendant St.Clair acknowledges that he parks like that on occasion, that when he drives down the street some cars

face in and some cars face out, and that it just depends on the person. St.Clair 181:20-182:4. And, although parking in a spot that happens to face an employee door would not of itself be indicative of criminal activity, defendants' claim that Mr. Hope's vehicle was facing the employee door of the restaurant is simply false. The employee door is alongside the drive-through on the south side of the restaurant, around the corner from where Mr. Hope was parked facing the west side of the restaurant. *See* Pl. Ex. 111; Pl. Ex. 92(#38)[3]. Defendants both testified for their attorney that Mr. Hope was parked facing the employee entrance and both were thereafter forced to acknowledge the falsehood of those statements. Ugarte 113:5-11, 132:10-133:2; St.Clair 252:19-23, 253:12-14, 285:11-15. The only thing their initial testimony as to the employee entrance provides is a demonstration that they can be prompted to swear to a falsehood concocted to serve their strategic interests, which does not support but rather undermines their position.[4] Defendants' insistence upon repeating this in the Motion, at 5, despite its having been disproven, is puzzling and disturbing.

Furthermore, although there is nothing indicative of criminality about picking any parking space far or near in any restaurant parking lot,[5] Mr. Hope was parked in a regular space in a relatively small restaurant parking lot on the west side of the Popeye's, with only two rows of parking and less than 20 spots. Pl. Ex. 14, Pl. Ex. 92(a). He was only seven spaces off of the main thoroughfare and was across the driveway and several spaces over from the restaurant entrance. Ugarte 60:10-12, 17-19. And, Ms. Bryant's testimony was not that there was anything

---

[3] This photo was an agreed exhibit on plaintiff's list but was not used at trial; the door is also visible on the video trial exhibits Pl. Ex. 13 and Pl. Ex. 91.

[4] Of course, concern about the employee entrance was not anything that was identified for investigators on the scene as a reason that defendants approached Mr. Hope. St.Clair 285:11-21

[5] As defense counsel even reminded the jury in her closing, Jenny Craig and Weight Watchers recommend parking far away from the entrance to get a little exercise. Tr. 618:16-18.

unusual about where Mr. Hope parked but merely that she noticed him as she walked from the day care to get a book from her car and that he was "just sitting there." Bryant 310:4-14.

Despite the lack of justification for detention of Mr. Hope, when defendants entered the parking lot he was put in a position immediately where he was blocked by the curb behind him and by a police SUV one to two feet in front of and perpendicular to his vehicle. As the Court stated in denying the defendants' motion for a directed finding concerning the seizure, "[H]e's been blocked into a parking space. The testimony is really consistent that there's a curb behind him and that the SUV is right in front of him . . . with maybe just a few feet difference . . . a reasonable jury could find that he was stopped at that point . . . ." Tr. 494:3-9. The Court further stated that "[a] reasonable jury could also find that the factors that [defense counsel] cited up to that point in time didn't add up to reasonable suspicion." Tr. 495:25-496:2. And, finally, the Court indicated that a directed finding in plaintiff's favor on her motion as to the seizure could well have been warranted, in suggesting that plaintiff's motion was a "closer one" and taking it under advisement. Tr. 498:17-22.

When the officers approached, Mr. Hope was in the driver's seat of his car in a parking spot on private property. Mr. Hope is described by Defendant St.Clair as holding a cellphone as the defendants approached, a perfectly legal activity. St.Clair 208:15-17. Defendants requested Mr. Hope's license, Ugarte 73:13-14, St.Clair 204:23-24, and Defendant Ugarte finally acknowledged at trial (after years of prevarication and denials) that Mr. Hope provided it when requested. Ugarte 73:13-74:18.

Defendants also note that Mr. Hope had currency in the cupholder of the center console of his car as he sat in the restaurant parking lot at lunchtime. Ugarte 77:13-16. Although it is described as a "bundle" in the motion, the testimony and photos from trial established that it was

less than 10 bills neatly folded, with a $100 bill on the outside and totaling $240, Ugarte 78:18-21; Resa 443:2-10, and defendants acknowledge that there was not a significant number of bills in stating in the motion that the $100 bill was wrapped around "several" other bills. Motion at 6. Defendant St.Clair admits that he could not see anything of the amount of money other than to know that it looked like US currency, St.Clair 207:20-208:4, and Defendant Ugarte knew nothing more about the amount than that it was over $100. Ugarte 78:8-9. It was legal for Mr. Hope to have that money out as he sat in his car, and defendants were aware that people do take money out before going through drive-throughs. Ugarte 78:10-11, 134:19-23.

Defendants had no information as to where the money came from or what it was to be used for, but they did know that it was the same currency used to buy food at the Popeyes and that it was a busy time for people to buy things like chicken and biscuits. Ugarte 78:15-17; St.Clair 208:5-14. It was less money than many people may often have loose in their pocket as they walk away from cash stations. Ugarte 134:3-18. Mr. Hope was never observed attempting to hide or conceal the money. Ugarte 83:18-23. He was only observed sitting in his car and was not seen trying to conduct any suspicious transactions. Ugarte 133:12-21. And the lead detective investigating the incident, who interviewed the defendants and whose responsibility it was to find out about the underlying circumstances of the incident leading up to the shooting and why the officers were doing what they were doing, wrote nothing in his narrative about currency in the car and acknowledged that it had no significance in the investigation. Resa 411:10-18, 424:21-23, 425:3-5.

The currency did not support reasonable suspicion of criminal activity by a man simply observed sitting in his car in a restaurant parking lot at lunchtime. And, the references to Mr. Hope having his windows down with the engine running, which Defendant St.Clair does not

recall from the time that they approached the car, St.Clair 203:16-18, or his not having food or a uniform in the car add nothing to the equation. All the officers observed of Mr. Hope and the car before he began to move it was that he was sitting in the car holding a cellphone in his lap. As defendants acknowledge, the law encourages people to be off the road and parked while using a cellphone. St.Clair 208:18-21. Although defendants only observed Mr. Hope for a matter of seconds, sitting in one's car for a period of time in a restaurant parking lot – or any other parking lot, for that matter – is a commonplace occurrence that may happen for any number of legitimate reasons.

Defendants offer no facts providing reasonable suspicion that criminal activity was afoot, but rather seek a determination as a matter of law that they have a right to seize a young African-American man observed for a matter of seconds as they are driving by just sitting in a car in a restaurant parking lot at lunchtime under a circumstance where there is no report of criminal activity and no suggestion from the department or a civilian as to involvement by him or his vehicle in criminal activity. And they alternatively posit that the latter portion of their seizure should be considered justified by the fact that, although he is not seen soliciting or engaging in any suspicious transaction, he happens to have several folded bills in his cupholder that he makes no attempt to hide. Defendants acknowledge the weakness of their own position in the conclusion to the argument in suggesting that they had reasonable suspicion to have a "conversation" with Mr. Hope. Motion at 6. What is at issue here is not a basis for wanting to merely have a conversation, but reasonable suspicion of criminal activity sufficient to warrant an investigative detention, which was never present.

B.    Defendants' seizure and detention of William Hope, Jr., is not shielded by qualified immunity.

Defendants' back-up boilerplate request for qualified immunity does not provide the protection that they seek. "To determine whether qualified immunity is appropriate, the Court must consider whether a 'reasonable officer could have believed that [his] conduct was constitutional in light of the clearly established law and the information possessed at the time the incident occurred.'" *Cross*, *10-11 (citations omitted). There has certainly been no ambiguity since *Terry* in 1968 that an investigative detention must be supported by reasonable suspicion that criminal activity is afoot. Defendants did not raise qualified immunity at summary judgment or in their Rule 50(a) motion and it does not warrant granting them relief at this stage.

Qualified immunity is not appropriate where a violation is so obvious that a reasonable officer would know that what they are doing violates the Constitution, or if a closely analogous case establishes that the conduct is unconstitutional. *Siebert v. Severino*, 256 F.3d 648, 654-655 (7th Cir. 2001). This is a case where the violation is substantiated by both of these methods. As this Court stated in *Cross*, *11, "as of [2003], any reasonable officer would have known that the *Fourth Amendment* requires articulable and objective suspicion that the individual had, was, or was about to engage in criminal activity before the officer could conduct an investigatory stop." Defendant officers observed Mr. Hope for a very brief time parked and sitting in his car in a regular restaurant parking place at lunchtime on a day when they had no information from the department as to criminal activity at the location, no information from a citizen as to criminal activity at the location, no familiarity with Mr. Hope, and no information from any source concerning criminal involvement regarding Mr. Hope or his vehicle. Defendants did not see Mr. Hope soliciting or transacting any business, did not see him approaching or checking out the restaurant, did not see him approaching any person and did not see any person approaching him.

Defendants did not see Mr. Hope hiding money or anything else in his car. Defendants did not conduct surveillance, run Mr. Hope's license plate or even stop and watch him for a few moments before parking in front of him and blocking his car. And, in fact, defendants do not even suggest in the Motion that they had an arguable basis for an investigative detention when they first pulled in front of Mr. Hope and blocked him and his car in, but rather, that they had reason to have a field interview to see "what, if any, activity was being conducted." Motion at 7. Accordingly, there can be no immunity for the initial illegal seizure. And the mere fact that a person has money out in his car in a restaurant parking lot at lunchtime does not provide any lawful support for the continued restraint of Mr. Hope.

Analogous case law also demonstrates that the seizure here does not even approach the line of permissibility. "Observing someone sitting in a legally parked car, without more, cannot justify a *Terry* stop." *Catledge v. City of Chicago*, 428 Fed. Appx. 646, 649 (7th Cir. 2011) (seizure of man in vehicle based on complaint of female that he was videotaping her). In *U.S. v. See*, 574 F.3d 309, 313-14 (6th Cir. 2009), the Court found it to be an invalid *Terry* stop where the officer parked in front of and blocked a vehicle containing three unknown men sitting in the car with its interior lights off at 4:30 am, with the car backed into a parking space in a dimly lit area of an apartment building parking lot distant from the apartment building, in a high crime area and under circumstances where the officer was instructed pre-shift to pay special attention to loiterers due to recent increase of robberies. And, in *United States v. Packer*, 15 F.3d 654, 658-59 (7th Cir. 1994), the Court found unlawful the *Terry* stop of four male occupants of a parked vehicle with windows fogged after 1:00 a.m. in December, where the vehicle matched the description in a citizen telephone complaint reporting a suspicious vehicle.

Furthermore, although defendants seek judgment on the state law detention claim in their prayer for relief, they do not discuss that claim in their request for qualified immunity and, as this Court noted in *Fields v. City of Chicago*, 2012 U.S. Dist. LEXIS 181645, *18 (N.D. Ill. Dec. 26, 2012), qualified immunity is a concept under 42 U.S.C. § 1983 that does not apply to state law claims. Thus, the claim of qualified immunity provides no basis for directing a verdict on the state law unlawful detention claim.

II.     DEFENDANTS ARE NOT ENTITLED TO A NEW TRIAL

Defendants offer two reasons in support of their request for a new trial. Neither of those reasons is valid and the request should be denied.

      A.     The Court's exclusion of certain evidence was proper and did not constitute error
           warranting a new trial

Decisions as to the admissibility of evidence are particularly within the discretion of the trial court and those decisions will be reversed only where no reasonable person could take the view adopted by the trial court. *United States v. L.E. Myers Co.*, 562 F.3d 845, 855 (7th Cir. 2009). An erroneous ruling will only warrant a new trial where the error "had a substantial influence over the jury, and the result reached was inconsistent with substantial justice." *EEOC v. Management Hospitality of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012) (quoting *Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558, 564 (7th Cir. 2006)). Here, the decisions rendered by this Court as to the evidence at issue were properly made within the discretion of the court, did not yield any result inconsistent with substantial justice and were clearly correct.

In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court teaches that deadly force decisions are to be judged objectively based on the observations of the officers on the scene. Although exceptions have been carved out to account for unusual circumstances, this remains the governing principle. Defendants try to construe *Common v. City*, 661 F.3d 940 (7th Cir. 2011), as

supporting their position and take snippets out of *Common* in an attempt to bolster that position; however, this Court is intimately familiar with the *Common* case and its application here was thoroughly addressed both in the motions in limine in this case, docket #82, motion #3, and at trial when the Court rejected defendants' renewed arguments on the admissibility of evidence concerning the firearm. The Court correctly found then that *Common* does not warrant admission of the evidence and defendants' Motion does not shed any new light on this point or provide any basis for finding that the prior rulings were in error. Also, it bears noting that *Common* did not overturn *Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988) or *Palmquist v. Selvik*, 111 F.3d 1332 (7th Cir. 1997) and confirmed the basic maxim from *Graham* that reasonableness of a use of force must be based on the circumstances "known and information available to the officer at the time of his action (firing the fatal shot)." *Common*, at 943. *See also Deering v. Reich*, 183 F.3d 645, 650 (7th Cir. 1999) ("…the totality of the circumstances …. includes information which the officer had at the time of his actions, but not information uncovered later.")

Defendants argue that they should have been able to present evidence of the firearm recovered from Mr. Hope's left pants pocket after his dead body was removed from the car as to motive for him to leave the scene, positing that it relates to a resolution of a difference in testimony of witnesses concerning Mr. Hope's movement of his vehicle, and suggesting that plaintiff argued that Mr. Hope did not move his vehicle. The premise of this argument is false. In fact, plaintiff acknowledged throughout the trial that Mr. Hope moved his vehicle and was attempting to leave when he was shot, and repeatedly referred to the "final resting place" of Mr. Hope's vehicle. Plaintiff did not challenge the basic description by the shooter, Defendant St.Clair, that Mr. Hope moved his car several times before being shot (first forward and to the left, then in reverse, and then again forward and to the left) at a speed of approximately two to

three miles per hour without striking the police SUV until after he had been shot and without

moving the wheels of his car laterally over the yellow line to the side of the parking space.

St.Clair 209:10-15, 213:4-21, 214:12-18, 226:9-14, 231:18-21. When defense counsel renewed

their effort to introduce the firearm into evidence, counsel for both sides confirmed that they

would not be arguing that the car did not move and that was the end of the issue. Plaintiff's

counsel then provided this same fundamental description in closing in describing what happened

with respect to the movements of the vehicle. Tr. 586:16-24, 604:20-25. And, in fact, this same

description of the movements of the vehicle was provided by plaintiff's counsel in opening as

well. Tr. 19:25-20:7. There was no real dispute over the movement of Mr. Hope's vehicle that

the jury was forced to reconcile in order to reach its verdict.[6]

Defendants state in the motion that they find support somehow for their position from the

testimony of Haji Bryant. In fact, plaintiff's counsel elicited testimony from Haji Bryant as to the

maneuvers of Mr. Hope's vehicle describing the same three movements (forward, backward, and

forward again) at a slow speed such as was described in plaintiff's closing. Bryant 312:21-

314:22, 316:22-317:4. Ms. Bryant's testimony gives further compelling reason to deny

defendants' motion and uphold the verdict, insofar as she testified that notwithstanding those

movements no officer was endangered. *Id.* And, she described how, after observing those three

movements of the vehicle, she heard the first shot and saw the remaining three. Bryant 314:23-

315:18, 321:4-25. One disturbing aspect of defendants' attempted reliance on Haji Bryant's

testimony in seeking a new trial, however, is that defense counsel were so aware of the damaging

nature of her testimony that they manufactured false impeachment material as to her in closing

---

[6] In fact, rather than supporting defendants' position with respect to the firearm evidentiary issue, all that the testimony of the witnesses as to limited movement of Mr. Hope's vehicle really does is support plaintiff's position that Mr. Hope was seized and detained.  See Patricia Polk 11:20-12:5, 13:1-14 (describing Mr. Hope as turning the wheel in an effort to get out "but he couldn't really go anywhere").

that both never happened and was never introduced into evidence, and used it as a basis for telling the jury that they should disregard her testimony entirely. Tr. 627:8-631:5; Pl. Ex. 74[7]. How they now claim to embrace her testimony is hard to fathom.

It is no surprise that defendants seek in their post-trial motion another chance to dirty up Mr. Hope's character and divert a jury from assessing the reasonableness of the use of deadly force based upon the objective facts as they were presented to Defendant St.Clair. However, to throw out the verdict in this case and afford them that opportunity would serve to frustrate substantial justice and not to advance it.

With respect to defendants' reliance on *Common*, it also bears noting that there are several other considerations that weigh much more strongly in favor of excluding evidence relating to the firearm in this case. First is the highly prejudicial nature of the evidence. In *Common*, the defendants argued in response to plaintiff's post-trial motion that it was insulting to the jury to think that they could be swayed to think that the shooting was justified by what the drug evidence reflected about the character of the decedent. 06-cv-6592, doc. #166, p. 6. The risk of such an improper influence on the decision-making process is obviously far greater here with defendants' attempt to let the jury know that Mr. Hope is a felon in possession of a weapon. Second is the lack of probative value of the evidence as to what the decedent was doing with his hands and timing of the events in the incident. In *Common*, defendants focused on needing the evidence for the jury to understand what decedent was doing with his hands after being told to raise them, where plaintiff claimed the decedent promptly put his hands up in the air and was shot immediately thereafter and defendants claimed that he initially turned away with his hands not visible to the officers before turning and grabbing for the gun and then being shot. 06-cv-

---

[7]  This is the report of the interview of Haji Bryant by Detective Pamela McClinton; it was on plaintiff's exhibit list, but Detective McClinton was not called as a witness and it was not used at trial.

6592, doc. #166, p. 4-5. Here, as was set forth in the motion in limine, docket #82, motion #3, there was no issue as to Mr. Hope ever doing anything with his hands in the area of the left pocket, from which the gun was reportedly recovered, and there was no dispute about timing. Nor was there any issue as to Mr. Hope ever doing anything with his hands to Defendant Ugarte or Defendant St.Clair. *Id.*; Ugarte 93:16-20; St.Clair 217:17-25; Bryant 313:20-314:3

Defendants' further suggestion that they deserve a new trial because the Court should have let in the evidence of the firearm in light of things that plaintiff's counsel "attempted to imply" about Mr. Hope during trial is also misplaced. The thrust of plaintiff's presentation concerning Mr. Hope's activities during the incident was on eliciting the facts known to the officers as they related to the basis for the seizure and the reasonableness of force. There was hardly anything that the officers saw him do – just sit, hold a phone, take out a license, and move the gear shifter and steering wheel – and it was essential that plaintiff's counsel convey that to the jury. If plaintiff's counsel made references to Mr. Hope that defense counsel thought improper, it was incumbent upon them to object at the time to give the court or plaintiff's counsel an opportunity to rectify any perceived problem, *Doe v. Johnson*, 52 F.3d 1448, 1465 (7th Cir. 1995), but they did not object to any statement of the sort as it was made during the trial. The jury knew Mr. Hope had spent two years in prison and of course defendants want to trump up a reason for a new trial where they can present the firearm and talk about parole, but it's not to help the jury find the truth. The basic issue as to Mr. Hope's activities before he was seized is that he was observed by the officers sitting in his car, and that is what plaintiff presented. The basic issue as to his activities leading up to the shooting is that he made three short maneuvers at slow speed before being shot, and that is what plaintiff presented. The evidence of the firearm wouldn't change anything about either of those, but would dirty up his

character, thereby causing prejudice instead of curing it. The Court instructed the jury that statements of counsel are not evidence and nothing in what defendants say plaintiff's counsel attempted to imply would have made a whit of difference in jury deliberations, let alone come anywhere close to the substantial prejudicial influence required to set aside a verdict. *Willis v. Lepine*, 687 F.3d 826, 834 (7th Cir. 2012). It is presumed that the jury follows the instructions, *Laxton v. Bartow*, 421 F.3d 565, 573 (7th Cir. 2005), and there is no reason to think that anything diverted the jury from proper consideration of the evidence as it relates to the instructions on any issue in this case.

Defendants deliberately ignore the real disputes and bury the fundamental considerations at the core of the jury's decision finding Defendant St.Clair liable for the shooting, which relate not to Mr. Hope's activities, but to the Defendants' false claims concerning their own activities and observations in the course of events. Defendants' justification preferred for the shooting was that Defendant Ugarte went into Mr. Hope's vehicle all the way up to the waist across where Mr. Hope was sitting in the driver's seat to seize control of the car and remained stuck in that position in the car at some supposed risk of being dragged to his death on the Dan Ryan up until the time that Mr. Hope had been shot and the vehicle came to rest. Ugarte: 97:13 -98:5, 100:2-7, 120:25 – 121:8; St.Clair 219:9-220:1, 226:9-227:2, 269:7-11. This position was preposterous and was proven false by the physical evidence, photographic evidence, eyewitness testimony, medical testimony and inconsistencies in the officers' own testimony, such as the following:

(a)     Testimony by both officers as to Defendant Ugarte ever being stuck in Mr. Hope's car and more particularly as to his being stuck in Mr. Hope's car until after the firing of four shots and the car subsequently striking the police SUV was contradicted by the surveillance video reflecting that Officer Ugarte was already running away from Mr. Hope's vehicle

simultaneously as Johnnie McGhee was flinching when Defendant St.Clair began to shoot. Ugarte 101:1-102:5; McGhee 375:21-376:4; Pl. Ex. 11 (video).

(b)     Testimony by both officers that Defendant Ugarte was stuck up to the waist in Mr. Hope's car at the time of the firing of the four shots was inconsistent with bullet damage to the vehicle reflecting a graze mark on a forward angle on the top of the middle of the driver's side door and a bullet exit hole under the passenger side mirror on a forward angle, both of which would have been aligned with bullets passing through the space where Defendant Ugarte was allegedly stuck. Resa 439:12-442:18; Pl. Ex 92(d),(e) and (f).

(c)     Testimony by both officers that Defendant Ugarte was stuck up to the waist in Mr. Hope's car at the time of the firing of the four shots was inconsistent with bullet wounds to Mr. Hope's arms, which were operating the gearshift and the steering wheel. Those wounds were described by the Medical Examiner, Dr. Cogan as: bullet #3 (entry wound on the outside of the left forearm and an exit wound on the inside of the left forearm) and bullet #4 (entry wound to the top of the inside the right forearm and an exit wound on the outside of the right forearm), both of which would have been aligned with bullets passing through the space where Defendant Ugarte was allegedly stuck. Cogan 341:12-346:3; Pl. Ex. 29(j),(k),(l),(m) and (n).

(d)     Testimony by both officers as to Defendant Ugarte ever appearing to being stuck in Mr. Hope's car was contradicted by the observations of all three independent eye witnesses. Bryant 316:14-16; McGhee 376:14-16; Polk dep. 15:5-8.

(e)     Testimony by Defendant Ugarte that he was stuck up to the waist in Mr. Hope's car up until the time of the firing of the four shots was inconsistent with his never saying that he was stuck or that he needed help. Ugarte 95:8-24, 98:12-14, 99:1-9; St.Clair 218:3-18.

(f)     Testimony by Defendant St.Clair that Defendant Ugarte appeared to be stuck up

to the waist in Mr. Hope's car up until the time of the firing of the four shots was inconsistent with Defendant St.Clair never asking if he was stuck, or asking if he needed help or reaching out to pull him away from the car. Ugarte 99:15-20; St.Clair 214:3-11, 218:19-219:4.

(g)     Testimony by both officers that Defendant Ugarte was struck by Mr. Hope's car was discredited by Defendant St.Clair's initial sworn statement that he saw Defendant Ugarte going into the car as soon as it started moving, St.Clair 212:10-16; by eyewitness testimony, Bryant 316:10-13; and by photos reflecting the minimal lateral movement of the car, Pl. Ex. 106.

(h)     Testimony by Defendants that Mr. Hope's window was up several inches and not all the way down before the shooting (seemingly offered as something for Defendant Ugarte to be stuck on), was discredited by testimony of Detective Resa as to the window being down in surveillance video and by the small amount of glass recovered on the scene so thoroughly that defense counsel in closing said: "His windows are down. Lord knows we've heard about that." Ugarte 71:21-72:1; St.Clair 301:8-13; Resa 447:18-448:2; Tr. 618:6-7.

(i)     Testimony by defendants as to a danger of Defendant Ugarte being dragged onto the Dan Ryan was contradicted by Defendant St.Clair's testimony as to the speed of Mr. Hope's car, St.Clair 213:8-12, by physical evidence (small dent in the SUV marking the final resting position of Mr. Hope's car, Ex 43(b), Ex 107) demonstrating Mr. Hope was far from being able to exit his parking spot at the time of the shooting and by the context of the defendants' testimony reflecting that this was a story cooked up special for trial. St.Clair 289:10-16.

The arguments in this case were not about what Mr. Hope did, but what the officers did. The jury's verdict is overwhelmingly supported by the evidence adduced at trial, and the excluded evidence of the firearm sheds no light at all on the disputed issues of the officers' actions here.

B.     The Court's jury instruction on seizure and detention damages was proper and did not constitute error warranting a new trial

Defendants' substantive position on this issue is wrong and is not supported by any authority offered. However, it should be noted preliminarily that this argument would not warrant a new trial.

The jury found for plaintiff on all counts against all defendants, including seizure and detention judgments as well as excessive force and battery judgments arising from the shooting. Given that the City has made it known that it will satisfy all compensatory damages on behalf of all defendants, no party potentially stands to be prejudiced, and the issue is entirely moot. Furthermore, the Court anticipated this argument, addressed it at the instruction conference and concluded that breaking down damages on the verdict form by category would allow for this very issue to be sorted out later if need be. Tr. 536:2-537:12; 552:14-553:7. The jury awarded damages in multiple categories, including $5000 for loss of liberty, and separate damages for pain and suffering, loss of life and loss of society. Defendants' objection to the jury instruction does not challenge the $5000 awarded for loss of liberty based on the seizure or detention verdicts. And, it does not provide a basis for overturning the damages for pain and suffering, loss of life and loss of society, which are independently sustainable based upon the excessive force and battery judgments. Accordingly, there is no justification for the remedy sought.

As to the substance, however, Section 1983 and Illinois law both incorporate common law tort principles of damages and causation. The authority previously tendered remains unchallenged: *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988) ("In constitutional-tort cases as in other cases, 'a man is responsible for the natural consequences of his actions.'"); and *Jackson v. Sauls*, 206 F.3d 1156, 1169 (11th Cir. 2000) (holding that defendant police officers in a §1983 case are liable for all reasonably foreseeable consequences of constitutional violation,

including firing of weapons by third parties). As the Court noted at trial, *Jackson* is the case most directly on point and supports the damages instruction tendered consistent with common law tort damages principles. Tr. 552:14-553:7. And, when the matter came up at trial, the Court left the issue open and invited defense counsel to present contrary authority if it was available, *Id.*, which they did not do then and have not yet done. Defendants acknowledge that *Plakas v. Drinski*, 19 F.3d 1143 (7th Cir. 1994), addresses liability and not damages. As for *Gauger v Hendle*, 349 F.3d 354 (7th Cir. 2003), the limitation of damages to those suffered prior to arraignment does not address the issue under consideration here.

With respect to what damages are recoverable, *Gauger* states that a successful tort plaintiff is entitled to "all damages that are a foreseeable consequence of the tort, and we have said that this principle is equally applicable to constitutional torts, including false arrest." *Id.* at 362. The *Gauger* court cited *Herzog v. Village of Winnetka*, 309 F.3d 1041, 1044 (7th Cir. 2002), which held that: "When an illegal arrest sets off a chain of indignities inflicted on the hapless victim, including offensive physical touchings that would be privileged if the arrest were lawful, she is entitled to obtain damages for these indignities whether or not they are independent violations of the Constitution. For they are foreseeable consequences of the illegal arrest, and the ordinary rules of tort causation apply to constitutional tort suits." In addition, in *Watts v. Laurent*, 774 F. 2d 168, 179 (7th Cir. 1985), the Court explicitly held that joint and several liability applies to §1983 cases, and that an injured party may recover full damages against any number of the parties responsible.

As to foreseeability of damages, Defendants Ugarte and St.Clair acknowledged being trained that officers are supposed to maintain distance so that they do not place themselves in a position of jeopardy and that overaggressive actions may cause and heighten the level of danger

to themselves and others. Ugarte 42:2-7; St.Clair 163:16-19. Both defendants were trained never to reach or climb into a vehicle and Defendant Ugarte was even trained by three separate police departments never to reach into or climb into a vehicle. Ugarte 42:13-44:5, St.Clair 165:13-19. The particular applicability of these principles in this case is immediately apparent in light of the closeness in time of the officers' seizure actions to William Hope Jr.'s death and excessively aggressive tactics used in the course of the seizure. Indeed, defendants themselves describe the shooting of Mr. Hope as occurring as Defendant Ugarte is attempting to commandeer Mr. Hope's vehicle by thrusting himself inside and trying to take control of the steering wheel and gearshift, after which Mr. Hope is said to have been shot as a result of Defendant Ugarte being in that same position of danger.

CONCLUSION

Defendants' arguments for a directed finding and for a new trial have no merit, and plaintiff respectfully requests that the Court deny the motions and affirm the jury verdict and judgment entered pursuant thereto.

Respectfully submitted,

/s Mark Parts
Mark Parts
Faith Spencer
Parts & Spencer, Ltd.
130 North Garland Court, #2005
Chicago, IL  60602
312-920-0990
mparts@pslegal.net
Illinois Atty. No.:  6203617

CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that he served Plaintiff's Response to Defendants' Post-Trial Motion upon all counsel of record in *McLin (Est. of Hope) v City, et al.*, 10 c 5076, by ECF on January 11, 2013.

<u>/s Mark Parts</u>